**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **WILLIAM GLISSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   Civil No.   12-cv-1301-CJP |
| | ) |
| **COMMISSIONER of SOCIAL SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff William Glisson is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB).[1]

## Procedural History

Plaintiff applied for benefits in October, 2011, alleging disability beginning on August 27, 2010.  (Tr. 15).   After holding an evidentiary hearing, Administrative Law Judge (ALJ) Stuart T. Janney denied the application for benefits in a decision dated August 30, 2012.   (Tr. 15-26). Plaintiff's request for review was denied by the Appeals Council, and the August 30, 2012, decision became the final agency decision.   (Tr. 1).

Plaintiff has exhausted his administrative remedies and has filed a timely complaint in this court.

## Issues Raised by Plaintiff

---

[1] This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).   See, Doc. 7.

Plaintiff raises the following issues:

1.     The ALJ erred in not giving greater weight to the opinions of his treating psychologist, Dr. Rosenberger.

2.     The ALJ's assessment of plaintiff's residual functional capacity was conclusory and did not explain how the medical evidence supported the findings.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).**   A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is  not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   **20 C.F.R. §§ 404.1520;** *Simila v. Astrue***, 573 F.3d 503, 512-513 (7th Cir. 2009);** *Schroeter v. Sullivan***, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler***, 737 F.2d 714, 715 (7th Cir. 1984).   See also,** *Zurawski v. Halter***, 245 F.3d 881, 886 (7th Cir. 2001)(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   The scope of judicial review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.   Thus, this Court must determine not whether Mr. Glisson was, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   **See,** *Books v.*

***Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995))**.  This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**.  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Janney followed the five-step analytical framework described above.   He determined that Mr. Glisson had not been engaged in substantial gainful activity since the alleged onset date. He is insured for DIB through December 31, 2016.   Plaintiff had done two tours of duty in Iraq. The ALJ found that plaintiff had severe impairments of obesity with disorders of the spine, history of bilateral degenerative changes in the knees, bilateral calcaneal spurs, obstructive sleep apnea, high blood pressure, traumatic brain injury, anxiety disorder, and posttraumatic stress disorder. The ALJ further determined that plaintiff's impairments do not meet or equal a listed impairment.

ALJ Janney concluded that Mr. Glisson had the residual functional capacity to perform work at the sedentary exertional level, with limitations.   Based on the testimony of a vocational expert (VE), he determined that plaintiff could not do his past work, but he could perform other jobs which exist in significant numbers in the national and local economy.   (Tr. 15-26).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff.

**1.      Agency Forms**

Plaintiff was born in April, 1982, and was 28 years old on the alleged onset date.   (Tr. 176).   He was in the Army from 2004 to August, 2011.   (Tr. 191).

Mr. Glisson said he was unable to work because of PTSD and trouble with his neck and knees.   He said he had trouble maintaining his composure and controlling his anger.   He had a hard time dealing with people.   (Tr. 168).   He lived with his family, and spent most of his time in the basement.   (Tr. 169).   He said he could not go out alone because he was "constantly on guard."   (Tr. 171).   He had nightmares and fears of crowds and loud noises.   (Tr. 174).

**2.      Evidentiary Hearing**

Plaintiff was represented by counsel at the hearing on August 13, 2012.   (Tr. 33).

Mr. Glisson lived with his wife, his two children and his parents.   He was pulled off of active duty on August 27, 2010, after a confrontation with his supervisors.   He has PTSD.   (Tr. 37).   He was blown up by an IED in Iraq.   His neck was injured, and he had a cervical fusion in December, 2009.   He still had neck pain.   (Tr. 41).   He had a traumatic brain injury which resulted in basilar migraine headaches.   He passes out if he gets overheated.   (Tr. 39).   He sleeps with a CPAP machine.   He sleeps only two and a half to three hours a night.   (Tr. 46).

Plaintiff testified that his wife took care of the kids.   His concentration problems made him unable to help with their homework.   Most of the time, he separates himself from everyone else.   (Tr. 42).

Being in crowds causes him to be short of breath and to have a lot of anxiety.   He is easily

angered.   (Tr. 43).   He is depressed and is easily startled.   He has nightmares.   (Tr. 47).   He sometimes hears voices, like radio traffic, and has flashbacks to the IED explosion and picking up body parts and putting them into trash bags.   (Tr. 52).

He goes to the VFW hall sometimes, but not very often.   His uncle is the commander of the post, and he tries to get plaintiff to get out of the house and talk to other veterans.   (Tr. 43).

The ALJ questioned plaintiff about whether he had gone to a firing range in view of his alleged symptoms.   He testified that he was merely dropping a friend off there.   (Tr. 49-50).

A vocational expert (VE) also testified.   The ALJ asked a series of hypothetical questions. The third hypothetical corresponds to the RFC assessment ultimately reached by the ALJ.   That question required the VE to assume a person who was able to do work at the sedentary exertional level, with the following limitations:

- Only occasional use of the feet to push/pull or operate foot controls;

- Only frequent (as opposed to constant) use of the bilateral upper extremities for reaching, handling and fingering;

- Only rote or routine instructions that require the exercise of little independent judgment for two-hour work segments;

- Frequent interactions with coworkers and supervisors, but no interaction with the general public;

- No concentrated exposure to hazards such as unprotected heights or dangerous machinery;

- No operation of commercial motor vehicle equipment.

(Tr. 54-57).

The VE testified that this hypothetical person could do jobs which exist in significant

numbers, such as stuffer, surveillance system monitor and bench hand.   (Tr. 57).

**3.** **Medical Records**

In October, 2008, plaintiff was seen by a psychiatrist, Joshua Elliott, at Munson Army Health Center.   He had served two tours of duty in Iraq, 2004-2005 and 2007-2008.   Since returning home in May, 2008, he had difficulty sleeping, waking up with palpations and sweating. He was easily startled and had difficulty maintaining concentration.   He had increased irritability and difficulty tolerating crowds.   He described two situations that were particularly troubling.   In June, 2007, he had to pick up body parts of U.S. soldiers who had been killed by an IED blast.   In the fall of 2007, he was the gunner on a Humvee which was hit by an IED.   Since then, he had hearing changes and chronic headaches.   The assessment was anxiety disorder NOS, rule out PTSD.   He was prescribed Celexa, and was to continue in psychotherapy.   (Tr. 679-681).   In January, 2009, he was improving, but still having symptoms.   Dr. Elliott diagnosed PTSD.   (Tr. 665).

On December 17, 2009, plaintiff had surgery on his neck consisting of discectomy and fusion at C4-5.   (Tr. 276-277).   In March, 2010, he was neurologically normal and had no complaints.   (Tr. 306).   In January, 2011, the neurosurgeon noted that his wound was nicely healed and his strength was intact.   (Tr. 304). A CT scan showed that the hardware was intact with no evidence of loosening.   (Tr. 293).

Mr. Glisson continued to see the psychiatrist, Dr. Elliott, in 2009 and 2010.   In July, 2010, Dr. Elliott evaluated him for a Medical Evaluation Board (MEB).   Mr. Glisson related an incident in Iraq in which a vehicle was approaching him and would not stop.   Mr. Glisson shot to disable the vehicle, and a female child in the back seat was shot and killed.   He reported that he had daily visual recollections of this event and daily feelings of overwhelming guilt.   He had nightmares

about this event most nights.   He was quick to lose his temper and had an exaggerated startle response.   He avoided crowds and rarely socialized.   He preferred to be in his basement, where there was only one way in and one way out.   About a month earlier, he had become extremely angry with his supervisors about a perceived demotion.   He had become concerned about what he might do if angry, and his wife removed his weapon from him.   He had been removed from his assigned duty as a criminal investigator.   Neuropsychological testing was done.   (602-610). Dr. Elliott concluded that Mr. Glisson did not meet Army retention standards.   He was "definitely disabled for military duty and for civilian employment.   PTSD signs and symptoms result in deficiencies in work, interpersonal relationships, judgment, thinking and mood."   (Tr. 611).

In August, 2010, Mr. Glisson told Dr. Elliott that he felt "significant relief since initiating the MEB."   He no longer felt that he would become assaultive.   (Tr. 598).

In September, 2010, an MRI of the right knee showed a tear of the medial meniscus.   (Tr. 703).   Arthroscopic surgery was done on September 27, 2010.   (Tr. 698).   In November, 2011, Mr. Glisson was seen for pain in his left knee. (Tr. 691- 693).   An x-ray was negative.   (Tr. 702).

Plaintiff had regular visits with social worker Brent Bengston at Munson Army Health Center.   On February 10, 2011, Mr. Glisson told Mr. Bengston that his MEB packet had been sent off to Fort Lewis.   He continued to have PTSD symptoms and felt blessed that he did not have to take on military duties since he felt that would exacerbate his symptoms.   He was still sleeping with a weapon under his pillow.   He felt it was an "accomplishment" that he was able to be in a crowd at his daughter's birthday party.   (Tr. 524).

On May 6, 2011, Mr. Bengston called plaintiff because he failed to show up for an appointment.   Plaintiff said he forgot about the appointment and he was at a shooting range.   Mr. Bengston could hear shots in the background.   (Tr. 506).

A different psychiatrist at Munson evaluated plaintiff for his MEB in May, 2011, as Dr. Elliott had left Munson.   Dr. Kenneth Fattmann noted that the MEB process had been delayed, in part due to Mr. Glisson's request in December, 2010, for an Impartial Provider Review because he was "not satisfied with having been found to fail retention standards on just the bases of PTSD and C4-C5 arthrodesis."   Mr. Glisson asserted that he had 18 other conditions as well, none of which, according to Dr. Fattmann, were disabling.   Mr. Glisson reported to Dr. Fattmann that he was not doing well.   Dr. Fattmann felt that his reported distress did not correspond to his level of treatment, as he had refused intensive outpatient treatment.   He had missed some appointments with Mr. Bengston, and had gone to a shooting range.   Dr. Fattmann questioned whether he had been taking his medications as prescribed, since there did not seem to be enough refills for that to be the case.   Dr. Fattmann also noted that Dr. Elliott always rated his GAF at 60-65, except on the day of the MEB exam, when he rated it at 45.   He remarked that Mr. Glisson "is clearly highly motivated to be perceived as disabled as possible, as evidenced by his attempt to be found unfit for retention due to conditions he does not have or are mild/not disqualifying."   Dr. Fattmann diagnosed him with PTSD by history and rule out personality disorder.   He rated his current GAF at 65.   (Tr. 493-495).

On September 6, 2011, Dr. Fattmann noted that he had been found to be 60% disabled. He would get his health care at a Veterans Administration facility when his eligibility was verified. He was applying for security/police jobs.   His wife did not think that his medications were as effective as they used to be as he was less motivated and more irritable.   He had difficulty sleeping.   The dosage of trazodone was increased.   (Tr. 481-484).   In December, 2011, he felt emotionally better after some medication changes, but was still having trouble sleeping.   His GAF was 74.   (Tr. 461).   In January, 2012, he told a nurse practitioner that Effexor was working and

his symptoms were controlled.   (Tr. 454).

Mr. Glisson went to the emergency room in January, 2012, with shortness of breath and chest pain and rapid breathing.   (Tr. 717).   The impression was a panic attack.   (Tr. 723).

Plaintiff moved to Illinois and began treating at the Veterans Administration Medical Center in Marion, Illinois, in February, 2012.   (Tr. 1046).   On the initial assessment, a PTSD screening test was positive.   (Tr. 1041).   He had nightmares and flashbacks, was easily angered and had difficulty sleeping.   (Tr. 1039).   A depression screening test showed moderately severe depression.   (Tr. 1044).   Mr. Glisson and his wife reported that he had suicidal thoughts in November, 2011.   (Tr. 1039).

He was assigned to Dr. Rosenberger in March, 2012.   (Tr. 1013).   In April, 2012, plaintiff and his wife met with a Caregiver Support Coordinator regarding the application process for the Comprehensive Assistance for Family Caregivers Program.   Mr. Glisson was described as very anxious and/or nervous, and fidgety.   He appeared to be struggling to take in information.   He was concerned that he had not yet been given an appointment with Dr. Rosenberger, and commented that he "really needs to see someone."   (Tr. 1073-1074).

Susan Rosenberger, Ph. D., saw plaintiff on April 12, 2012, to assess whether Prolonged Exposure (PE) Therapy was appropriate for him.[2]   She noted that his mood was anxious and depressed, and that he met the DSM-IV diagnostic criteria for PTSD.   Dr. Rosenberger concluded that he was an appropriate candidate for PE Therapy.   (Tr. 1070-1071).

Dr. John Fienhold assessed plaintiff for a possible concussion during deployment on April 16, 2012.   Mr. Glisson told him that he hit his head when an IED exploded near his Humvee in 2007.   Since then, he had ongoing headaches and memory/attention problems.   On exam, his

---

[2]  PE therapy is a type of therapy for PTSD.   According to the VA, it is "one of the most effective treatments for PTSD.   See, http://www.ptsd.va.gov/public/pages/prolonged-exposure-therapy.asp, accessed on November 6, 2013.

cranial nerves were grossly intact.   Sensation to light touch was intact and he had full strength in his upper and lower extremities.   He had mild tenderness to palpation along the cervical paraspinals.   Cervical flexion/extension was mildly impaired, and rotation side to side was moderately impaired.   He was referred for a CT scan of the brain.   (Tr. 1065-1069).   A CT scan of the head was normal on May 2, 2012.   (Tr. 1050).

Mr. Glisson attended a total of nine PE Therapy sessions with Dr. Rosenberger from April 30 to July 25, 2012.   (Tr. 1061-1063, 1051-1053, 1109-1110, 1104-1105, 1091-1092, 1174-1175, 1170-1171, 1165-1167, 1149-1151, 1141-1142).   She documented some progress, but noted on the last visit that Mr. Glisson continued to struggle with PTSD and depression, and he was "still exhibiting significant symptoms of PTSD.   (Tr. 1141).

Plaintiff was seen by a psychiatrist at Marion VAMC, Dr. Shelley Brown, on May 30, 2012.   He and his wife identified "anger and aggression" as his primary symptoms, and both felt he was "doing as poorly as he has ever done."   About 5 days a week, he did not want to leave the house.   He had trouble sleeping.   He would sleep for only 2 hours a night, and then stay up for days and then sleep for 24 hours.   He had night terrors.   He avoided crowds due to apprehension of panic attacks, anger outbursts and anxiety.   His flashbacks during the day had improved significantly.   He and his wife reported that he "passes out" when he gets hot, and this had been going on for years.   His mental status exam was normal except that his mood was irritable and anxious.   His short term memory was intact.   His GAF was assessed at 51.   The doctor adjusted his medications.   (Tr. 1115-1123).

A neurologist saw him on June 14, 2012, and noted that he had a normal CT scan of the head.   This doctor felt his headaches might be basilar migraines, and prescribed propranolol. (Tr. 1096-1099).

Plaintiff was seen again by psychiatrist Shelley Brown, on July 13, 2012.   His mental status exam was normal except that his mood was irritable and anxious.   His short term memory was intact.   His GAF was assessed at 51.   The doctor adjusted his medications.    (Tr. 1157-1162).

Memory testing on July 13, 2012, showed that plaintiff had good memory.   His reported memory difficulties were thought to be related to poor sleep, distractibility and other PTSD symptoms.   (Tr. 1152-1154).

**4.      Consultative Examination**

There were no consultative psychological or physical exams.

**5.      State Agency RFC Assessments**

Based upon a review of the medical records, a state agency psychologist assessed plaintiff's mental RFC in January, 2012.   The psychologist also completed a Psychiatric Review Technique form in which she summarized records she had reviewed.   The most recent record referred to was from January, 2012.   See, Tr. 752.   Thus, it does not appear that she reviewed any of the records from Marion VAMC.   She opined that plaintiff had moderate limitations with regard to detailed instructions, maintaining attention and concentration for extended periods, interacting with the general public, accepting instructions and criticism from supervisors, getting along with coworkers and responding appropriately to changes in the work setting.   She concluded that he could understand, remember, and carry out simple instructions, interact adequately with peers and supervisors and adapt to usual changes in the workplace.   (Tr. 754-756).

A state agency physician rated his physical RFC.   He opined that plaintiff could do light work with postural limitations and limited reaching in all directions.   (Tr. 757-763).

6.    **Dr. Rosenberger's Opinion**

Dr. Rosenberger completed a form that was similar to the mental RFC assessment form used by the state agency psychologist.   In Dr. Rosenberger's opinion, Mr. Glisson was markedly limited in a number of areas, including ability to understand, remember and carry out detailed instructions, ability to maintain attention and concentration, ability to interact with the general public, ability to accept instruction and criticism from supervisors and ability to complete a normal workday and workweek without interruption from psychologically based symptoms.   This form was dated July 11, 2012.   (Tr. 1137-1138).

**Analysis**

Plaintiff is correct in arguing that the ALJ erred in his handling of Dr. Rosenberger's opinion.

Dr. Rosenberger was a treating doctor.   Social security regulations refer to a treating doctor as a "treating source."   With regard to the assessment of treating source opinions, 20 C.F.R. §404.1527(c)(2) states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. [Emphasis added]

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."   20 C.F.R. §404.1527(a)(2).   A treating doctor's

medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record.   *Clifford v. Apfel*, **227 F.3d 863 (7ᵗʰ Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7ᵗʰ Cir. 2001).**

If the ALJ determines that a treating doctor's opinion is not entitled to controlling weight, he is required to evaluate the treating doctor's opinion and determine what weight to give it considering the factors set forth in 20 C.F.R. §404.1527(d).   An ALJ must give "good reasons" for discounting a treating doctor's medical opinion; if the opinion does not merit controlling weight, the ALJ must consider the "checklist of factors" set forth in §404.1527(d).   *Campbell v. Astrue*, **627 F.3d 299, 308 (7ᵗʰ Cir. 2010)**, citing *Larson v. Astrue*, **615 F.3d 744, 751 (7ᵗʰ Cir.**

Here, ALJ Janney discounted Dr. Rosenberger's opinion because it was "inconsistent with the evidence discussed above."   He also remarked that no other healthcare provider "indicated that claimant had the limitations found by Dr. Rosenberger."   (Tr. 24).

The ALJ's discussion of the medical evidence omitted any analysis Dr. Rosenberger's records.   Dr. Rosenberger treated Mr. Glisson's PTSD with PE Therapy.   The records document nine sessions from April 30 to July 25, 2012. Dr. Rosenberger assessed plaintiff's GAF from 48 to 51.   (Tr. 1061-1063, 1051-1053, 1109-1110, 1104-1105, 1091-1092, 1174-1175, 1170-1171, 1165-1167, 1149-1151, 1141-1142).   The course of therapy had not been completed as of the last record.   According to the last note, Mr. Glisson continued to struggle with PTSD and depression, and he was "still exhibiting significant symptoms of PTSD.   (Tr. 1141).   The ALJ offered no analysis of whether Dr. Rosenberger's opinion was supported by her own findings, as required by §404.1527(c)(2).

Further, ALJ Janney failed to note that a psychiatrist at Marion VAMC, Dr. Shelley Brown, saw plaintiff twice and assessed his GAF at 51 on both visits.   (Tr. 1115-1123;

1157-1162).   Arguably, Dr. Brown's records are consistent with Dr. Rosenberger's opinion.

While the ALJ does not have to discuss every single piece of evidence, he is required to "build a logical bridge from evidence to conclusion."   ***Vilano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009), and cases cited therein.**   This means that the ALJ cannot simply ignore a line of evidence that contradicts his conclusions.   Rather, he must "confront evidence that does not support his conclusion and explain why it was rejected."   ***Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).**   It should be obvious that the ALJ must fairly consider all of the medical evidence before he rejects a treating doctor's opinion as not inconsistent with the evidence as a whole.

The ALJ relied heavily on Dr. Fattmann's disagreement with the low GAF score that had been assessed by Dr. Elliott.   He said that he gave more weight to Dr. Fattmann's GAF score of 60.   Again, he failed to note the GAF scores that were assessed by Drs. Brown and Rosenberger. Because the GAF score measures both the severity of symptoms as well as the level of functioning, and it reflects the worse of the two, the Seventh Circuit has held that "the score does not reflect the clinician's opinion of functional capacity" and the ALJ is not required to determine disability "based entirely" on the GAF score.   ***Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).** However, the Seventh Circuit has also held that, while the ALJ need not base his opinion "entirely on GAF scores," it is error for the ALJ to discuss only high scores and ignore evidence of low scores.   ***Walters v. Astrue*, 2011 WL 5024149, \*5 (7th Cir. 2011).**

The ALJ's second reason for rejecting Dr. Rosenberger's opinion is similarly weak, since other treating doctors were not asked to assess Mr. Glisson's functional RFC by completing a form like the form completed by Dr. Rosenberger.   Dr. Elliott stated that plaintiff was "definitely disabled for military duty and for civilian employment.   PTSD signs and symptoms result in

deficiencies in work, interpersonal relationships, judgment, thinking and mood."  (Tr. 611).

While not expressed in the same terms as Dr. Rosenberger's opinion, Dr. Elliott's ultimate

conclusion is consistent with Dr. Rosenberger's.   Further, while Dr. Fattmann disagreed with Dr.

Elliott's GAF assessment, he did not dispute his ultimate conclusion that Mr. Glisson's PTSD

rendered him disabled for military duty and civilian employment.   And, no one apparently asked

Dr. Brown to render her opinions as to Mr. Glisson's RFC.

    In view of the ALJ's selective analysis of the medical evidence, the Court also finds that

his RFC assessment is not supported by substantial evidence.

    Because of the ALJ's errors, this case must be remanded.   The Court wishes to stress that

this Memorandum and Order should not be construed as an indication that the Court believes that

Mr. Glisson is disabled or that he should be awarded benefits.   On the contrary, the Court has not

formed any opinions in that regard, and leaves those issues to be determined by the Commissioner

after further proceedings.

### Conclusion

    The Commissioner's final decision denying William Glisson's application for social

security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing

and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

    The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   November 6, 2013.**


                    **s/ Clifford J. Proud____**
                    **CLIFFORD J. PROUD**
                    **UNITED STATES MAGISTRATE JUDGE**